**SEND / ENTER / JS-6**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br>v.<br>NICHOLAS A. CZUCZKO,<br>Defendant. | Case No. CV 06-4792 ODW (SSx)<br><br>ORDER GRANTING PLAINTIFF'S UNOPPOSED MOTION FOR SUMMARY JUDGMENT<br><br>ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF |

## I. INTRODUCTION

This is a securities fraud case arising out of Defendant Nicholas A. Czuczko's ("Defendant") alleged fraudulent scheme to profit from stock recommendations posted on his Internet website, thestockster.com. Plaintiff Securities and Exchange Commission ("Plaintiff") filed this action on August 1, 2006, alleging the following claims for relief: (1) Violation of section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b) and Rule 10b-5, codified at 17 C.F.R. § 240.10b-5; (2) Violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); and (3) Violation of Section 16(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(a) and Rule 16a-3, codified at 17 C.F.R. § 240.16a-3. Plaintiff seeks disgorgement of profits, interest, and a

civil penalty. Plaintiff also seeks a permanent injunction against Defendant.

On August 14, 2007, the parties stipulated to and the Court granted a Permanent Injunction Order. The Order stated that Defendant shall pay disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty pursuant to section 20(d) of the Securities Act and section 21(d)(3) of the Exchange Act. Defendant agreed that he would be precluded from arguing that he did not violate federal securities laws as alleged in the Complaint. The parties also stipulated that the Court would determine the amount of disgorgement and civil penalty on motion by Plaintiff. Accordingly, Plaintiff filed its instant Motion for Summary Judgment ("Motion") on October 22, 2007. On November 2, 2007, Defendant filed a notice of non-opposition pursuant to Local Rule 7-9.

## II. FACTUAL BACKGROUND

Because Defendant has not opposed Plaintiff's Motion, the following facts are deemed to be undisputed.

On approximately December 11, 2005, Defendant registered the Internet domain named www.thestockster.com[1] through a service that shielded his name from publicly available registration information. (UF[2], 1.) Defendant designed the website, which was free to all visitors, to appear as if it offered objective investment advice. (UF, 2.) A description on the main page of the website claimed that the site "helps investors win at investing on the merits of radically original thinking and an unbeatable track record of picking stocks with huge

---

[1] Defendant also registered www.stockesteem.com, which he used from December 8, 2005 through December 15, 2005, at which time he began operating thestockster.com website. (UF, 35-45.) The design and purpose of www.stockesteem.com was nearly identical to that of www.thestockster.com. (UF, 37-45.)

[2] The Court cites Plaintiff's Separate Statement of Uncontroverted Facts ("UF") in support of its Motion for Summary Judgment.

potential." (UF, 3.) Defendant uploaded daily stock recommendations to the website, touting each pick as a "mega bonus buy." (UF, 4.) Defendant posted only "buy," but never "sell" recommendations. (UF, 5.)

For each stock recommendation, Defendant included the current share price and an allegedly misleading "target price." (UF, 6.) The target prices, which were always higher than the current trading prices, gave the impression that Defendant had conducted a financial analysis of the recommend stocks. (UF, 7.) The website included a "disclaimer" that described the site as an "independent research company" that "published unbiased research." (UF, 13.) However, contrary to the above assertions, Defendant had no reasonable basis for the target prices and his recommendations were biased in favor of stocks in which he held an interest and planned to profit from undisclosed near-term sales. (UF, 8, 14).

There was another disclaimer on the website that included the statements "[w]e own shares" and that "[o]fficers, directors, and employees of The Stockster or the financial analysts mentioned, and members of their families *may* hold a position[] and *may*, *from time to time*, trade in these securities for their own accounts." (Complaint at ¶¶ 13-14) (emphasis in Complaint). Plaintiff argues that this statement in and of itself is misleading because Defendant actually did own the securities before he posted the recommendations. (Id.) He also knew he owned the stock and he had a present intent to sell his shares for profit as soon as the recommendations led to an increase in the price of the shares. (Id.)

To bolster the website's stock picking credibility further, Defendant posted the following statement on the website: "We've brought you MSFT, GOOG, SIRI, CMGI, JDSU, and others you've made a killing on." (UF, 9.) However, this assertion was false because Defendant never recommended Microsoft Corp., Google, Inc., Sirius Satellite Radio, Inc., CMGI, Inc., or JDS Uniphase Corp. (UF, 10.) In fact, most of the stocks recommended on the website from December 15,

2005 to March 30, 2006 were little known and thinly-traded "penny stocks." (UF, 11.)

By early 2006, www.thestockster.com began attracting a relatively large number of visitors. (UF, 17.) The share price of the recommended stocks usually rose as buyers, following the site's recommendations, entered the market to purchase shares of these stocks. (UF, 18.) Similarly, trading volume in a recommended stock typically spiked after the pick was posted on the site. (UF, 19.) The trading volume and the share price of the recommended stock typically declined when the website ended its recommendation of a stock and selected a new stock as its "mega bonus buy." (UF, 20.)

Between December 15, 2005 through March 20, 2006, Defendant recommended approximately 60 stocks as "mega bonus buys" on the Stockster website. (UF, 21.) Defendant typically bought shares of the recommended stocks shortly before he posted the pick on the website. (UF, 23.) Defendant would then typically begin selling his shares at the same time he continued to recommend that visitors buy the stock. (UF, 25.) Defendant never changed the recommendation on the website from "buy" to "sell." (UF, 26.) Plaintiff argues that Defendant's failure to disclose his intent to sell his shares materially misled those website visitors who bought shares based on Defendant's alleged "unbiased" investment advice. (UF, 29.) In short, Defendant was able to turn a quick profit at the expense of the investors who followed the website's advice.[3] (UF, 30.)

On approximately December 12, 2005, Defendant recommended Epic Media

---

[3] Defendant's father, Nicholas Czuczko, Sr., and business partner, Epic Media's Chief Operating Officer, John Yeung, also traded stocks recommended on the website using advance information about the recommendations. (UF, 31.) Defendant never disclosed his father's or Yeung's trading practices or actual sales on the website. (UF, 32.) Plaintiff argues that Defendant's failure to disclose this information about his father and Yeung materially misled the website visitors because the visitors expected "unbiased" investment advice. (UF, 33.)

stock – a penny stock – as a “mega bonus buy” on the stockesteem website. (UF, 44.) Defendant did not inform website visitors that he was an officer and director of Epic Media, nor did he disclose that he owned approximately 58 percent of the company’s outstanding shares. (UF, 45.) The price of Epic Media’s shares rose nearly 36 percent following the recommendation on Defendant’s website. (UF, 46.) As a result of trading in Epic Media stock between December 8, 2005 and December 14, 2005, Defendant made total profits of $53,165. (UF, 49.)

In summary, Defendant used his website to recommend obscure stocks whose prices are well known to be easily manipulated. (UF, 51.) Defendant generally bought stock before he posted his buy recommendations on his website. (UF, 58.) Defendant’s stock purchases caused the stock prices to rise. (UF, 59.) Then, Defendant would recommend the stocks on the website. (UF, 56, 60.) Because of his scheme, Defendant was able to sell his shares at higher prices. (UF, 56.) However, since the higher prices generally fell during and after Defendant sold, many buyers suffered losses immediately or within a day or two if they continued to hold their positions. (UF, 57.) Defendant earned total profits of at least $1,552,463 from his website scheme, calculated by adding the net profits of $53,165 Defendant earned from his trades of Epic Media together with the $1,499,298 in profits he earned from other trading during the period. (UF, 65.)

In addition, on September 11, 2006, after Plaintiff filed its Complaint in the current action, Epic Media filed a certificate with the Securities and Exchange Commission terminating its registration. (UF, 66.) On February 23, 2007, a company named Liberty Presidential Investment Funds, Inc. issued a press release announcing that it had begun to trade publicly under the symbol LPIF. (UF, 67.) John Yeung, the former COO of Epic Media, was listed as the LPIF’s investor relations contact. (UF, 69.) An online company snapshot of LPIF reveals that it was formerly known as YouMee, Inc. and Epic Media, Inc. and that it is located at

the same address as that of Epic Media. (UF, 70.) Between February 23 and March 15, 2007, Defendant purchased 400 shares of LPIF stock for $90. (UF, 72.) Between February 23 and March 15, 2007, Defendant's father earned approximately $19,000 by selling a total of 626,716 LPIF shares. (UF, 73.) In addition to the activity surrounding LPIF, as of the November 19, 2007, thestockster.com website was still up and running.

## III. LEGAL STANDARD

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id*. at 323-34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## IV. DISCUSSION

Because Defendant does not oppose Plaintiff's Motion, the Court takes the

facts as true as presented by Plaintiff.[4] Therefore, using the facts as alleged in the Complaint and in the documents supporting Plaintiff's Motion, the Court will exam whether Plaintiff has proven each of its three claims for relief.

**1. Plaintiff's Claims One and Two: Violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act**

"Section 17(a)(1) of the Securities Act, Section 10(b) of the Securities and Exchange Act, and Rule 10b-5 prohibit fraudulent conduct or practices in connection with the offer of sale of securities, including making a material misstatement or omission *in connection with* the offer or sale of a security by means of interstate commerce." *S.E.C. v. Rubera*, 350 F.3d 1084, 1094 (9th Cir. 2003) (citing *S.E.C. v. Dain Rauschers, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001)) (emphasis added). Scienter, which is a "mental state embracing the intent to deceive, manipulate or defraud," is required to establish securities fraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Ninth Circuit has held that recklessness satisfies the scienter requirement. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990). Circumstantial evidence can support a strong inference of scienter. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388-89 (9th Cir. 2002); *see also In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 974-75 (9th Cir. 1999).

Here, Plaintiff alleges that Defendant violated the above-mentioned statutes and regulations because he made materially false statements with the requisite scienter. Specifically, Plaintiff argues that Defendant recommended stocks on his website without having a reasonable basis for the recommendation. Further, Defendant hailed his recommendations as "unbiased" when in fact he had a biased

---

[4] In Defendant's Answer to Plaintiff's Complaint, he invoked his Fifth Amendment right against self-incrimination. A witness may invoke the Fifth Amendment in a civil case, but the refusal to answer permits the trier of fact to infer that the answer would have been favorable to the party propounding the question. *Baxter v. Palmigiano*, 425 U.S. 308, 316-18 (1976).

interest in recommending certain stocks, because he would sell his stocks at a profit once the website visitors began buying. Plaintiff also contends that Defendant misled website visitors by noting that he had previously recommended companies such as Microsoft and Google when Defendant knew that his site never recommended such stocks. Defendant also presented visitors with a "target price" for the stocks he recommended, but actually had no basis for such a prediction.

In addition, Defendant placed a disclaimer on his site that stated "[o]fficers, directors, and employees of The Stockster or the financial analysts mentioned, and members of their families *may* hold a position[] and *may*, *from time to time*, trade in these securities for their own accounts." (Complaint at ¶¶ 13-14) (emphasis in Complaint). In the case of *S.E.C. v. Blavin*, the Sixth Circuit examined an investment newsletter with a similar disclaimer. 760 F.2d 706 (6th Cir. 1985). The company in *Blavin* disclaimed that they "may trade for [their] own account." *Id*. at 708. The court held that this statement was "false and misleading." *Id*. at 711. The court reasoned that the disclaimer:

> created an impression that [the publisher of the newsletter] was an investment company with numerous employees whose investments were not all known to management, when in fact [the company] was a sole proprietorship of [the defendant], who had invested [in] the publicly available stock of companies he recommended. In this factual context, a disclaimer that the investment advisor "may" trade in recommended securities for its own account is itself a material misstatement.

*Blavin*, 760 F.2d at 711.

Similarly, here, Defendant's disclaimer gave the impression that there were numerous employees at www.thestockster.com when it is the Court's understanding that Defendant was one of the only employees maintaining the website. In addition, Defendant's assertion that employees of thestockster.com "may" trade in the recommended securities is itself a material misstatement because Defendant *knew* that he, his father, and his business partner *did* regularly trade in the stocks and *had a biased interest* in the recommended stocks.

Therefore, Plaintiff has satisfied its burden by showing that Defendant made materially false statements in connection with the sale of securities.

Plaintiff must also demonstrate that Defendant acted with the requisite scienter. To prevail on this element, Plaintiff must show that Defendant either knowingly or recklessly made the materially false statements discussed above. It is evident that Defendant made the statements on his website to attract visitors who would purchase stock, which would in turn lead to profits for Defendant. Through circumstantial evidence, the Court can clearly infer that Defendant knew that the statements were materially false and that he had the requisite scienter to be found liable for securities fraud. Accordingly, Plaintiff has proven claims one and two of its Complaint.

**2. Plaintiff's Claim Three: Violation of Section 16(a) of the Exchange Act and Rule 16a-3**

Section 16 of the Securities and Exchange Act of 1934 contains two separate provisions. Section 16(a) requires that all officers, directors, and large shareholders report to the SEC any changes in their "beneficial ownership" of equity securities of their corporations. Section 16(b) imposes liability on such "insiders" for short-swing transactions in such securities. 15 U.S.C. § 78p(a, b). Rule 16a-3 details the reporting of transactions and holdings that is required under section 16(a).

Here, Plaintiff alleges that in 2005 and 2006 Defendant was an officer and director of Epic Media and a beneficial owner of 58 percent of Epic Media common stock. From about July 2005 through March 2006, Defendant failed to file statements accurately reflecting changes in his beneficial ownership of Epic Media common stock. Therefore, taking the facts in Plaintiff's Complaint as true, Defendant has violated Section 16(a) of the Exchange Act and Rule 16a-3.

**3. Damages**

a. Disgorgement of Profits

"Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1191-92 (9th Cir. 1998). In support of its disgorgement request, Plaintiff relies primarily on the expert opinion of Professor Lawrence Harris. Professor Harris calculated the profits that Defendant made on his trades by subtracting the summed dollar value of all his sales from the summed dollar value of all his purchases and concluded that Defendant's trading profits amounted to $1,499,298.[5] Harris Dec. Ex. A at 16, ¶ 51. In addition, Plaintiff calculated that Defendant made net profits of $53,165 from his sales of Epic Media; this stock was excluded from Professor Harris' calculation. Accordingly, under the above authorities, the Court Orders that Defendant disgorge a total of $1,552,463 in ill-gotten gains from his stock manipulation scheme.

b. Prejudgment Interest

Plaintiff Commission has calculated prejudgment interest from April 1, 2006, the first day of the month after Defendant Czuczko ceased trading stocks promoted on his website, to November 1, 2007, the first day of the month in which this Motion was scheduled to be heard. *See S.E.C. v. First Jersey Secs.*, 101 F.3d 1450, 1477 (2nd Cir. 1996) (affirming payment of prejudgment interest from time

---

[5] At the November 19, 2007 hearing on this Motion, the Court instructed Plaintiff to submit a supplemental brief to detail the exact method of calculation used to reach the $1,499,298 in profits attributed to Defendant Czuczko's fraudulent scheme. On December 3, 2007, Plaintiff submitted a supplemental declaration of Lawrence Harris. Professor Harris included a table indicating that the total value of Czuczko's profits was $1,499,298. The total value of Czuczko's sales ($5,933,244) exceeded the total value of his purchases ($4,433,946). The difference of $1,499,298 represents Czuczko's total trading profits. The Court finds that Plaintiff's supplemental briefing sufficiently establishes the profits that Czuczko earned from his fraudulent stock manipulation scheme.

of defendants' unlawful gains to entry of judgment), *cert. denied*, 522 U.S. 812 (1997); Anderson Dec. ¶ 12 & Ex. 12. In this Circuit, prejudgment interest may be calculated using the method established for calculating interest on judgment, pursuant to 28 U.S.C. § 1961. *See Blanton v. Anzalone*, 760 F.2d 989, 993 (9th Cir. 1985); *Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1288-89 (9th Cir. 1984).

Employing this method, Plaintiff seeks prejudgment interest in the amount of $121,105.64. The Court agrees with Plaintiff's reasoning and calculation in determining prejudgment interest.

c. Civil Penalty

As discussed above, the Court finds that Defendant has violated federal securities laws as alleged in Plaintiff's Complaint. Due to Defendant's violations, Plaintiff asks this Court to impose civil penalties against Defendant pursuant to the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, 15 U.S.C. § 78u(d)(3) ("the Remedies Act").[6] Plaintiff Commission suggests that each of

---

[6] 15 U.S.C. § 78u(d)(3) provides as follows:
(A) Authority of Commission -
Whenever it shall appear to the Commission that any person has violated any provision of this chapter, the rules or regulations thereunder, ... the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation.
(B) Amount of penalty -
(i) First tier-The amount of the penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.
(ii) Second tier-Notwithstanding clause (i), the amount of penalty for each such violation shall not exceed the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.
(iii) Third tier-Notwithstanding clauses (i) and (ii), the amount of penalty for each such

Defendant's violations should fall within the third tier of civil penalties available under the Remedies Act. *See* 15 U.S.C. § 78u(d)(3)(B)(iii) (allowing, for each violation, a $100,000 penalty against a natural person if the violation involved fraud/manipulation and created a significant risk of substantial losses to other persons). Penalties can be assessed for each separate violation, which courts may measure either by the number of instances of volatile conduct or by each separate claim for which the defendant is found liable. *See, e.g., S.E.C. v. Henke*, 275 F.Supp.2d 1075, 1084 (N.D. Cal. 2003) (applying the third tier and multiplying $100,000 by the number of causes of action alleged in the complaint); *S.E.C. v. Kenton Capital Ltd.*, 69 F.Supp.2d 1, 17 (D.D.C. 1998) (applying third tier penalties and multiplying by the number of persons harmed by the defendant's fraud).

Here, the Court construes Defendant Czuczko's overall stock manipulation scheme as one violation under 15 U.S.C. § 78u(d)(3)(B)(iii). Therefore, the Court will impose an across-the-board, third-tier civil penalty of $100,000.

## V. CONCLUSION

After careful examination of the evidence presented, the Court finds that Defendant is liable for Claims One, Two, and Three as alleged in Plaintiff's

---

violation shall not exceed the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if-(aa) the violation described in subparagraph (A) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (bb) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

Complaint. Therefore, Plaintiff's Motion for Summary Judgment is GRANTED. The Court hereby Orders that Defendant disgorge a total of $1,552,463 in ill-gotten gains from his stock manipulation scheme plus prejudgment interest thereon in the amount of $121,105.64, calculated for the period April 1, 2006 through November 1, 2007 at the weekly average one-year constant maturity Treasury yield rate in effect closest in time to April 1, 2006. Defendant is also ordered to pay $100,000 as a civil penalty.

JUDGMENT: Based on the foregoing, judgment is hereby entered in favor of Plaintiff.

IT IS SO ORDERED.

DATED: December 5, 2007

Otis D. Wright II
United States District Judge